**IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF KANSAS**

FILED
U.S. District Court
District of Kansas

JUL 01 2022

Clerk, U.S. District Court
By _____ Deputy Clerk

NOE ESPINO

Petitioner,

vs.                                          Case No: 2:03CR20051

UNITED STATES OF AMERICA

Respondent.

---

**MOTION FOR REDUCTION IN SENTENCE PURSUANT TO
18 U.S.C. § 3582(c)(1)(A)(i);**

---

**<u>INTRODUCTION</u>**

People grow, mature and evolve, and because conditions and circumstances

change, it is virtually impossible to make sound decisions when first imposing

sentence about precisely how long someone should spend behind bars. But that is

exactly how the federal criminal justice system works. Judges are required to act as

if they are omniscient and the prison terms they impose are – for all intents and

purposes – final. Despite having no realistic hope of ever being released from

prison Espino has done everything in his power to rehabilitate himself as

1

demonstrated by his genuinely exceptional accomplishments and meritorious

prison record.

He does not seek to justify, diminish, or detract from the seriousness of his

offenses. And he unequivocally accepts responsibility for his criminal conduct.

Espino was 20 years old at the time of his arrest and eventually sentenced to life in

prison.

Mr. Espino, was just 20 years old when arrested, was sentenced to life

imprisonment at the age of 20. After decades of reflection, Mr. Espino has come to

understand—and to bitterly regret—the harm his crimes caused to others. He has

become not only a model prisoner but a model human being. Other inmates look

up to him, staff of the Federal Bureau of Prisons ("BOP") admire him, and he

devotes significant effort to helping prisoners reform themselves.

In 2015 Espino wrote a letter that was construed as a motion for a reduction

in sentence. This Court commented, "While the court commends Mr. Espino for

his efforts to rehabilitate himself, the court must dismiss Mr. Espino's motion

because it simply is not authorized to reduce Mr. Espino's sentence under the

circumstances described by Mr. Espino. A district court is authorized to modify a

defendant's sentence only in specified instances where Congress has expressly

granted the court jurisdiction to do so. United States v. Price, 438 F.3d 1005, 1007

(10th Cir. 2006) (citations omitted). Congress has not authorized district courts to

modify prison sentences based on a defendant's good conduct or other

accomplishments achieved during a defendant's incarceration. The court, then,

lacks jurisdiction to consider Mr. Espino's request." Dkt#654 at 1-2.

This Court now has the authority to reduce the sentence based on all of the

factors outlined below including, and in conjunction with  the extraordinary

rehabilitation in this case.

Without the Court's intervention, Mr. Espino will die in prison. Mr.

Espino's youth at the time of the offense, the moral character he has developed

over the intervening decades, his extraordinary rehabilitation, (which it is likely no

other prisoner has done as much in this regard as Mr. Espino), the severity of his

sentence, the excessive length of the sentence he has served, and the fact that Mr.

Espino has been living under restricted circumstances in light of COVID-19, as

well as the dangers associated with Covid-19 that Mr. Espino faces constitute

extraordinary and compelling circumstances warranting a reduction of this

sentence.

## **FACTS**

In 2004, defendant Noe Espino was found guilty of conspiracy to distribute

and possess with intent to distribute 500 grams or more of methamphetamine. He

was sentenced to life imprisonment based on the murder enhancement contained in

U.S.S.G. §§ 2D1.1(d)(1) & 2A1.1. The Tenth Circuit affirmed his conviction and

sentence on appeal and, in 2008, this court denied Mr. Espino's § 2255 motion.

Mr. Espino has also requested compassionate release in the past. Since that time

many factors as well as the law have changed and evolved.

## ARGUMENT

Mr. Espino's sentence of life imprisonment, at the age of 20 years old is

and was, extraordinary. Mr. Espino received an effective sentence that has

taken away the most productive years of his life, and has ensured that he

would die in prison. He has been in prison for over 19 years for the crimes at

issue here.

There is no excuse for his actions, however, he submits that the current

sentence is longer than necessary in this case to achieve the objectives that a

sentence be sufficient but not greater than necessary, to achieve the goals of

sentencing as spelled out in 18 U.S.C. § 3582.

Serving an original sentence of life imprisonment was not easy for a

20-year-old young man to accept and deal with. Mr. Espino used his time

in prison productively, and committed himself to changing his character.

Entering prison as a young man with such a harsh sentence was not easy.

There were two roads for Espino to choose from, one was a road of

4

mischief and trouble. The other was a road of self-betterment and rehabilitation. Espino chose the latter. Mr. Espino has become the change that he seeks to see in others.

Espino chose a road of self-betterment. In his pursuit of his rehabilitation, he made exceptional strides in bettering himself. He has completed numerous rehabilitative programs. Those programs include but are not limited to teaching mentoring younger prisoners, working as the Prison Chaplin's orderly/clerk, earning his GED IN 2015, Small Engines, Victim Impact, Parenting Classes, Self-Study, Financial Peace, Mock Job Fair, Interviewing Skills, Drug Programming and a host of others, (See Exhibit A). At the top of this list are the high intensity federally approved programs that Espino has enrolled in and completed. Those include the Challenge Program, and Suicide Companion Program. See Exhibit A.

It is rare when Federal Prison staff members write character letters for prisoners. In Mr. Espino's case there have been numerous letters over the years attesting to his character who he is today. For example, Dr. M. Miststifer writes, "Inmate Espino has played an integral role as a Challenge Program graduate, and has consistently demonstrated effective listening, processing and communication skills…." Inmate Espino additionally serves as an inmate Suicide Companion … and is extremely

active in the religious services department where is viewed as having strong leadership skills." "Inmate Espino has consistently demonstrated that he is dependable and responsible. His reliability is exemplary and his maturity a community asset."

Teacher D. Baker writes, "From my observations and interactions with Mr. Espino, I note him to be a model citizen within the correctional setting. He mentors inmates with various backgrounds in order to help change the environments of the United States Penitentiary in Tucson Arizona."

Staff Chaplin P. Raybon writes, "Mr. Espino began working as an orderly and quickly earned the position of Chapel Clerk. His leadership skills, work ethic, Christian Character, and undaunted desire to improve are the reasons why he was chosen for the challenging position of the Chapel Clerk."

Even correctional officers (which is extremely rare), have attested to who Mr. Espino is today, and how he has evolved. Senior Officer M. Escobar writes, "My experience with him has been pleasant and during the years that I have been employed here I have noticed a tremendous amount of dedication and positive change in him. He shows attention to detail as well as leadership skills in and out of work. It is clear that his peers look

6

up to him as a role model and come to him to seek advice. He has earned the respect of his peers and Officers at this institution…" See Exhibit B. There are many more letters from all different federal prison employees attesting to who Mr. Espino is.

Not only has staff written glowingly about Mr. Espino's efforts and changes but other prisoners have done the same. Christopher Cavana writes, "Mr. Espino was assigned as my senior peer mentor…" "The support that Mr. Espino displays towards those he helps is beyond compare I have no doubt that Mr. Espino has, through his caring touched the lives of many other individuals." There are numerous letters here attesting to how much help Mr. Espino is and has been to all of the other prisoners. See Exhibit C.

Espino also has maintained an excellent work record in prison helping both staff and prisoners as evidenced by the above-mentioned facts. Mr. Espino has used his life experiences in an effort to help others.

Mr. Espino's record of rehabilitation can be considered extraordinary, as well as Espino's age at the time of his crime.  Espino submits that he is no longer the immature 20-year-old young man who made irrational and irresponsible choices to engage in criminal conduct, and that there is no

concern that he would be a danger to the public if released. This is because he has learned to respect the rule of law, in conjunction with his rehabilitation.

This Court can also consider Espino's age at the time the crime was committed, as that is another extraordinary reason that militates for a reduction in sentence in this case. Many courts have correctly relied on the age of the defendant in determining that extraordinary and compelling reasons existed in reducing a "stacked 924(c) case". See ***United States v. Maumau***, 2020 U.S. Dist. LEXIS 28392 (D. Utah 2020).

Section 608 of the recently enacted First Step Act of 2018 specifically states that the term "youth" will be defined as: "In this title, the term 'youth' means a prisoner (as such term is defined in section 3635 of title 18, United States Code, as added by section 101(a) of this Act) who was 21 years of age or younger at the time of the commission or alleged commission of the criminal offense for which the individual is being prosecuted or serving a term of imprisonment, as the case may be." (First Step Act, Section 608 (1)(c)). This newly enacted definition of youth establishes that Noe Espino, who was a 20-year-old at the time of the offense, is now classified as a youth pursuant to the First Step Act. He is, therefore, entitled to numerous protections established by the United States Supreme Court to ensure that "youths", as they are now defined by federal statute, are protected from cruel and unusual punishments in violation of their Eighth Amendment rights under the Constitution. Specifically, they are protected against

8

the imposition of extreme sentences. In many cases this relates to life sentences

for juveniles but the facts are clear that those that are under 21 years old develop

differently and make decisions that they likely would not make with a fully

developed brain.

### A. *MILLER v. ALABAMA*, 567 US 460 (2012)

On June 25, 2012, the Supreme Court ruled that as to homicides committed

by youths, mandatory life in prison without parole constitutes cruel and unusual

punishment. (While Espino is not incarcerated for murder the logic as to young

men who commit crimes is significant to this case), *Miller v. Alabama*, 567 US

460 (2012). The Court found that the issue implicated two lines of Eighth

Amendment cases. First, the Court pointed to cases wherein the Court adopted

categorical bans based on mismatches between culpability of a class of offenders

and the severity of the punishment. See *Roper v. Simmons*, 543 US 551 (2005)

(declaring capital punishment cruel and unusual as to juveniles/youths); *Graham v.

Florida*, 560 US 48 (2010) (life without parole was cruel and unusual punishment

for non-homicide crimes committed by juveniles/youths). The Court held that these

categorical bans reflected juveniles/youths' diminished culpability and greater

prospect for reform, which made them less deserving of the most extreme forms of

punishment. Id. at 469. The Court cited three <u>significant gaps in teenager's</u>

<u>culpability</u> that rendered life in prison without parole cruel and unusual: First,

**teenagers have a lack of maturity and an underdeveloped sense of**

**responsibility, leading to recklessness, impulsivity, and heedless risk-taking.**

*Roper*, 543 US, at 569. Second, teenagers are more vulnerable...to negative

influences and outside pressures, including from their family and peers; they have

limited control over their own environment and lack the ability to extricate

themselves from horrific, crime-producing settings. Ibid. And third, a teenager's

character is not as well formed as an adult's; his traits are less fixed and his actions

less likely to be evidence of irretrievable depravity. Id., at 570. (Emphasis added)

The Court noted that although Graham cited these differences in the context of

analyzing non-homicide crimes by teenagers, "none of what it said about children -

- about their distinctive (and transitory) mental traits and environmental

vulnerabilities-- is crime specific," and that it should also be applied to homicides

committed by teenagers. Id. at 470. The Court further noted that ***Graham*** had

likened life without parole for teenagers to a death penalty, thereby evoking a

second line of the Court's precedents that prohibited mandatory imposition of the

death penalty and required that sentencing authorities consider the characteristics

of a defendant and the details of his offense before sentencing him to death. Id. at

473-74, citing ***Woodson v. North Carolina***, 428 US 280, (1976) (plurality opinion)

and **Lockett v. Ohio**, 438 US 586, (1978). Therefore, laws mandating life in prison

without parole for homicide violate the Eighth Amendment to the extent that they

subject a juvenile to the same life-without parole sentence applicable to an adult,
and precluded a sentencing authority from assessing whether the law's harshest
terms of imprisonment proportionately punish a juvenile offender. As a result, the
Court declared a new rule: Mandatory life without parole for a juvenile [youths]
precludes consideration of this chronological age and its hallmark features –
among them, immaturity, impetuosity, and failure to appreciate risks and
consequences. It prevents taking into account the family and home environment
that surrounds him—and from which he cannot usually extricate himself—no
matter how brutal or dysfunctional. It neglects the circumstances of the homicide
offense, including the extent of his participation in the conduct and the way
familial and peer pressures may have affected him. Indeed, it ignores that he might
have been charged and convicted of a lesser offense, if not for in competencies
associated with youth—for example, his inability to deal with police officers or
prosecutors (including on a plea agreement) or his incapacity to assist his own
attorneys...And finally, this mandatory punishment disregards the possibility of
rehabilitation even when the circumstances most suggest it. Id. at 473. (Emphasis
added).

> **(1) Adolescent decision-makers in general are less future-oriented and
> less likely to properly consider the consequences of their actions.**

When compared to adults, studies show that adolescents are less likely to consider alternative courses of action, understand the perspective of others or restrain impulses. In a study of more than 1,000 adolescents and adults, researchers investigated the relationships among the factors of age, maturity, and antisocial decision-making. See: Elizabeth Cauffman & Laurence Steinberg, Immaturity and Judgment in Adolescence: Why Adolescents May Be Less Culpable Than Adults, 18 Behav. Sci. & L. 741 (2000). Adolescents, on average were "less responsible, more myopic, and less temperate than the average adult." Id. at 757. In this study, the most dramatic change in behavior occurred sometime between 16 and 19 years of age, especially with respect to "perspective" (i.e., consideration of different viewpoints and broader contexts of decisions), and "temperance" (i.e., the inability to limit impulsivity and evaluate situations before acting). Id. at 756. And it was not until age 19 that this development of responsible decision-making plateaued. The enactment of the First Step Act demonstrates that Congress has now come to agree with the empirical findings and evidence made through numerous in-depth studies and reports—that adolescence does not end at 17 years of age. Rather, by defining the term "youth" in the Act as, "any prisoner.... **who was 21 years of age** or younger at the time of commission or alleged commission of the offense for which the individual is being prosecuted or serving a term of imprisonment, as such the case may be,"

12

Congress has expanded the reach of the protections set forth by the Supreme

Court in Miller, thereby ensuring that the criminal justice system would in fact be

just.

(2) **The youthful mind.**

In 2007, the Supreme Court held that federal judges were free to sentence

beneath the guideline ranges set forth by the Sentencing Commission provided

that the guideline range was properly considered by the sentencing judge. ***Gall v.***

***United States***, 551 U.S. 38 (2007); ***Kimbrough v. United States***, 552 U.S. 85, 109

(2007). Supreme Court decisions have increased justifications for this trend, citing

research proving physiological characteristics of teenagers such as: (1) their lack

of maturity and underdeveloped sense of responsibility that leads to recklessness,

impulsivity, and heedless risk-taking; (2) their vulnerability to negative influences

and outside pressures, including from family and older negative influences; and

(3) their limited control over their environment and inability to extricate

themselves from disadvantaged circumstances in which they find themselves. See:

***Miller v. Alabama***, 567 U.S. 460, 469 (2012). [O]ne of the hallmarks of

adolescent risk taking is that it is much more likely than that of adults to occur in

the presence of peers, as evidenced in studies of reckless driving, substance abuse,

and crime. Peer pressure "can arouse emotions of fear, rejection, or desire to

impress friends [family] that can undermine reliability of adolescent behavioral

control systems and result in actions taken without full consideration or

appreciation of the consequences."

The Supreme Court has also recognized the profound mitigating weight that

these characteristics deserve when considering any crimes committed by a

teenager. See ***Montgomery v. Louisiana***, 577 U.S. __ (2016) (only in the rarest

cases will the transient immaturity defining "youth" fail to decisively mitigate

against life imprisonment for murder). The Fair Sentencing for Youth (FSY)

organization presents relevant evidence of the serious need to review the long-

term sentencing of youth. In their article, "The Need for Change," FSY discusses

the problems with existing law, including the fact that while the law tends to

ignore youths' unique ability to change, FSY's research suggests otherwise: Youth

can and do commit terrible crimes. When they do, they should be held

accountable and face appropriate Punishment. But youth are different from adults;

youth have greater capacity for rehabilitation. Recent findings in Neuroscience

confirm what many have long known: Brain maturation is a process that continues

into early adulthood, and impulse control, planning, and thinking ahead skills in

development well beyond into the 20's... young people who commit crimes are far

more likely to reform their behavior and have a better chance at rehabilitation

than adults... The Supreme Court agrees with FSY's assessment. In Roper v.

Simmons, 543 U.S. 551 (2005) the Court opined: From a moral standpoint it

14

would be misguided to equate the failings of a minor with those of an adult, for greater possibility exists that a minor's character deficiencies will be reformed. It is appropriate to provide youth with periodic reviews of their life sentences to ensure that those who prove they have reformed are given an opportunity to re-enter society as contributing citizens. The FSY article further indicates that 81% of the public agrees with these concepts. Noe   Espino was 20 years old when this offense occurred. His impulse control and thinking skills were nowhere near fully developed. Research confirms that cognitive maturity, including such factors as abstract thinking, moral intelligence, seeing how behavior can affect the future, associating cause and effect, planning and decision-making, seeing what is not obvious, understanding the rules of social conduct, and mature judgment, does not occur until a young person is in his mid-twenties. (Healthy Futures, OnMyLevel.org). Due to Espino's youth and immaturity, he was particularly vulnerable to the negative influences of those around him.

**(2) Neuroscience and brain development from 18-21 years old.**

A recent neuroscience study, "Jurisprudence on Evolving Standards of Decency," discusses the youthful mind and clearly demonstrates that the 18-year-old cutoff date referenced in Roper, Miller and Graham is wrong as a matter of science and social norms. Instead, the study indicates that 21 years of age should be the proper cut-off date. Interestingly, that is the same age referenced in the

15

First Step Act as defining a youth. In ***Roper, Graham, Miller*** and ***Montgomery***,

the Supreme Court cited developments in neuroscience and social science that

confirmed the commonsense observation that young peoples' brains are different

from adult brains in ways that make young people less morally responsible for

their actions. In ***Roper***, the Court acknowledged that the qualities that distinguish

juveniles from adults do not disappear when an individual turn eighteen. Id, at 9.

At that time, the Court reasoned that the scientific and social information

available in 2005 made the age of eighteen an appropriate place to draw the line,

while acknowledging that any bright line rule would be open to criticism, and

could later be changed as science and society evolved and gained more insight on

the matter.24 New research in neuroscience and brain development have made

clear that the 18- year old cutoff chosen in ***Roper*** and ***Miller*** is too low:

Development in neuroscience confirm that impulsivity, a tendency to engage in

high-risk behavior, a strong susceptibility to peer pressure, and a high degree of

personality plasticity characterize people under 18 just as they characterized the

juveniles described in ***Miller, Graham***, and ***Roper***. These traits are the product of

asynchronous neurological developments that are common to juveniles and

people between 18 and 21: although the brain's reward centers are fully developed

and primed for impulsive action, the regions of the brain that regulate higher

reasoning and emotional control remain immature. Put another way, the brains of

people under 21, unlike adults' brains but like teenagers' brains, are capable of triggering adult emotions but are not capable of managing or processing those emotions. During the late teens and early 20's, a young person's brain is undergoing rapid changes in the areas of the brain most closely connected to impulsivity and decision-making. Specifically, recent neuroimaging studies show that the volume of white matter in the brain is relatively stable until around age 21, when it begins to increase dramatically. That is important because white matter fibers transmit information between neurons, allowing different regions of the brain to communicate with each other. In practice, this means that the brains of people under 21 are poorly integrated. Additionally, increased white matter volume in the front limbic system — a part of the brain that is not fully developed until after age 21 — enables individuals to modulate anxiety, deal with fear, and become socially adept. Because of these developmental deficits, people under 21 have difficulty generating appropriate responses to fear, envisioning the future and understanding consequences. The brains of people under 21, like those of people under 18, also remain immature in three areas that support self-control and emotional regulation: the amygdala, the prefrontal cortex, and ventral striatum... this makes young adults 'more vulnerable to impulsivity', less capable of emotional reasoning and more likely to make 'errors in self-regulation.' Specifically, recent studies show that people in their late teens and early 20's have

a 'sensitivity to environmental factors in terms of the stability of personality

features during this phase' and a unique plasticity of character that fades as they

reach their mid-20's. These factors also mean that people in their late teens and

early twenties are uniquely susceptible to peer pressure. Id., at 11-14 There is no

doubt that these findings have articulated a fact long suspected by researchers, but

scientifically proven here. The brains of those in their late teens prior to the age of

21 are no different than those of juveniles from a developmental and culpability

level. "Similarly, MRI studies indicate that the brains of people in their late teens

and early 20's lack the structural development that is necessary for higher level

reasoning and emotional regulation." Id., at 13.

### (3) Society's treatment of people under 21.

In considering why Congress increased the cut-off age between youth and

adulthood from eighteen to twenty-one in the First Step Act, the simple answer is

that the Act recognized what has long been accepted by society. As set forth in

Exhibit 1, the neuroscience study quoted extensively from above: Society treats

people under 21 more like teenagers than adults, acknowledging — at least tacitly

— the fact that brain development is not complete by the age of 18. In Roper, the

Court looked to age restrictions in various state laws unrelated to capital

sentencing and concluded that states' prohibitions on "voting, serving on juries, or

marrying without parental consent' were indications that the states recognized "the

comparative immaturity and irresponsibility of juveniles." Those same kinds of

restrictions exist for people under the age of 21. Significantly, many of the

restrictions on people under 21 have been adopted in the wake of Roper, as

society's perceptions of youth have evolved. For example, all 50 states and the

District of Columbia impose a minimum age restriction of 21 years for the

consumption, purchase, or possession of alcohol or recreational marijuana. Over

425 cities and counties in 22 states now prohibit the sale of tobacco to people

under 21. Forty-one states impose a minimum age of 21 to obtain concealed carry

permits for firearms, and federal law prohibits licensed gun dealers from selling

handguns and ammunition to people under the age of 21... rental car companies

will not rent to drivers under the age of 21 and apply added fees for drivers under

the age of 25. A 2014 report from the United States Department of Justice

recommended that legislators raise the age for criminal court to at least twenty-

one, in light of the fact that "young adult offenders ages 18-24 are, in some ways,

more similar to juveniles than to adults. Notably, these restrictions are all

categorical: none of these laws permit a 21-year-old to engage in the prohibited

behavior if they can make an individualized showing of maturity. Id at 15-17 The

fact of the matter is that there is no longer doubt, nor even debate, on the proper

19

cut-off date for a youth to become an adult. The Congress, by passing the First Step Act, has agreed with the empirical evidence that clearly shows that a person is still a youth, at least from a criminal justice standpoint, until he/she reaches twenty-one years of age. As the Supreme Court noted in ***Graham, supra***:

*"Condemning an immature, vulnerable, and not yet-fully-formed adolescent to live every remaining day of his life in prison - whatever his crime - is thus constitutionally disproportionate punishment" because it "guarantees he will die in prison without any meaningful opportunity to obtain release."* In discussing this disproportionate punishment, the Supreme Court recognized the injustice of this outcome, holding that life without parole is an especially harsh punishment for a juvenile because a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender. Graham, supra. "A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only." Id. In fact, a youth sentenced to life without parole not only serves a greater percentage of his life in prison, but suffers a unique deprivation: He will never experience adulthood—or the ability "to attain a mature understanding of his own humanity, ***Roper, supra***, at 574—as a free person.

In United States v. Ramsay, one Court held that a defendant's "youth at the time of the offense, his upbringing, and his demonstrated rehabilitation, taken

together, are extraordinary circumstances that compel a sentence reduction." 538

F. Supp. 3d 407, 426 (S.D.N.Y. 2021). Relying on a combination of Supreme

Court precedent and psychology, the Court reasoned that a defendant seeking

compassionate release may explain why his youth contributed, whether in full or

in part, to the commission of the underlying offense. Certain attributes of youth

warrant consideration, including: (1) immaturity, (2) susceptibility to negative

influences and outside pressures, (3) salvageability, and (4) dependence. See id. at

416-422; see also Rengifo, 2021 WL 5027334, at *12 (applying analysis under

these factors where a defendant was 23 years old at the time of the offense).

Citing cases involving defendants between 17 and 24 years old, the Court

observed "a defendant's relative youth may contribute to a finding of

extraordinary and compelling circumstances." Ramsay, 528 F. Supp. 3d at 415,

415 n.5 (citing Brooker, 976 F.3d at 238 ("Zullo's age at the time of his crime[,

between 17 and 20,] . . . might perhaps weigh in favor of a sentence reduction.");

United States v. McCoy, 981 F.3d 271, 286 (4th Cir. 2020) ("[T]he courts [below]

focused on the defendants' relative youth—from 19 to 24 years old—at the time

of their offenses, a factor that many courts have found relevant under §

3582(c)(1)(A)(i)."); United States v. Jones, 482 F. Supp. 3d 969, 979 (N.D. Cal.

2020) (granting a sentence reduction because, among other reasons, "Mr. Jones

was only 22 years old when he began serving his sentence, [so] he has spent more

than half his life in prison"); United States v. Harris, No. CR 97-399-1, 2020 WL

7861325, at *13 (E.D. Pa. Dec. 31, 2020) (granting a sentence reduction because

of, among other reasons, the defendant's "relatively young age at the time of the

offenses," namely, 24 years old)). This type of court analysis in Ramsay should be

extended to Mr. Espino.

Compounding Mr. Espino's relative youth at the time of the offense was his

quite limited intellectual and associated cognitive functioning . . . . [combined

with] impulsive behavior, poor judgment, limited comprehension, and extremely

poor verbal expression [as] an intellectually naïve individual. This is a case where

all of these factors were present. Each of the four traits Ramsay identified as

distinctive of youth are implicated here. Thus, Mr. Espino exhibited the type of

"maturity gap" courts should bear in mind. See Ramsay, 538 F. Supp. 3d at 420.

First, immaturity, combined with an underdeveloped sense of responsibility,

often result in "impetuous and ill-considered actions and decisions." Ramsay, 538

F. Supp. 3d at 417 (quoting Roper v. Simmons, 543 U.S. 551, 569 (2005)). There

should be no doubt in this case that Mr. Espino exhibited an underdeveloped

sense of responsibility as most 20 years old do.

Second, young people tend to be vulnerable and susceptible to negative

influences and outside pressures. See id. The Court observed that young people

are more likely to engage in risk taking in the presence of their peers than more

mature adults. This was recognized by law makers and the Supreme Court as discussed above.

Third, regarding salvageability, Mr. Espino's efforts align with the above-mentioned decision and conclusion that youthful offenders "who engage in criminal or delinquent behavior desist from crime as they mature." Ramsay, 538 F. Supp. 3d at 422. Mr. Espino has subsequently demonstrated an impressive degree of maturation and rehabilitation, not only accepting responsibility for his criminal activities, but undertaking activities to learn skills and better himself. See Rengifo, 2021 WL 5027334, at *12.

Since his sentencing, he has regularly been engaged in various therapy programs, and group therapy sessions aimed at improving his decision-making, accepting responsibility for his actions, and acknowledging the impact that his crimes and his incarceration have had on him and those around him. He has also completed a plethora of academic courses and skills courses, preparing him for a successful life outside of prison. These efforts will enable him to operate as a productive member of his community and support himself and his family, and it further confirms that Mr. Espino's crime was an aberration and not "evidence of irretrievably depraved character." See Rengifo, 2021 WL 5027334, at *12 (quoting Roper, 543 U.S. at 570).

Another factor that this Court can consider in its assessment as to whether or not a sentence reduction is appropriate in this case is the current COVID-19 pandemic, and the dangers to prisoners associated with it. Espino is currently housed at Federal Correctional Institution Tucson. He has been living under extreme conditions that this Court can consider along with the new variants of the virus to which it is unknown whether or not the current vaccines can help.  See United States v. Hatcher, 18-cr-454-10 (KPF) (SDNY 4-19-21).

The next factor the Court should consider as extraordinary and compelling is the harsher conditions of confinement under COVID-19 and Mr. Espino's particular health risks. Mr. Espino has experienced unusually harsh conditions of confinement as a consequence of the severe lockdown measures undertaken by the BOP to control the spread of COVID-19 in prison. These conditions include "constant lockdowns and other unusually severe conditions of confinement necessary to reduce the risk of COVID infection in the close quarters of a prison." Henareh, 2021 WL 119016, at *5. These lockdown measures rendered almost two and a half years of his sentence significantly "harsher and more punitive than would otherwise have been the case." Rodriguez, 492 F. Supp. 3d at 311; see also United States v. Garcia, 505 F. Supp. 3d 328, 332-33 (S.D.N.Y. 2020) ("[H]eightened restrictions imposed upon all prisoners during the pandemic . . . ma[de] the conditions of confinement harsher, both physically and psychologically,

than they would otherwise normally be."). The lockdowns prevented Mr. Espino

from seeing family and having any meaningful social contact, and from basic

physical movement within the prison—as was well known throughout the BOP

during the pandemic.

The facility to which Espino is housed has seen both staff members and

prisoners infected with the virus, and some die. See,

https://www.bop.gov/coronavirus/.

### **The Relevant Factors Weigh Strongly in Favor of a Sentence Reduction.**

In deciding Mr. Espino's request for a sentence reduction, the Court must

determine whether, after considering the factors set forth in 18 U.S.C. § 3533(a),

extraordinary and compelling circumstances warrant that relief, and, if they do,

that Mr. Espino is not a danger to the safety of any other person or to the

community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13. When deciding

a motion for relief under 18 U.S.C. § 3582(c)(1)(A)(i), the Court should consider

the history and characteristics of the defendant, the sentencing disparities with his

codefendants, and other factors that bear on who the defendant is today. See

U.S.S.G. § 1B1.13 (requiring consideration of, inter alia, the factors set forth in 18

U.S.C. § 3553(a)). As explained below, the § 3553(a) factors weigh strongly in

favor of relief in Mr. Espino's case, and he poses no danger.

The § 3553(a) Factors Weigh in Mr. Espino's Favor. As discussed above, Mr. Espino was 20 years old and had cognitive impairments at the time of his criminal conduct, participation in a drug conspiracy that resulted in the killing of another person. Notably, Mr. Espino has an excellent disciplinary record over the last 12 years. In fact, there was one disciplinary report in which Mr. Espino was assaulted by another prisoner and refused to fight back. He took the licks of a deranged prisoner until staff responded to pull the person of Mr. Espino. See Exhibit D. As this Court is well aware this takes a lot of self-discipline and is another example of Mr. Espino's maturity.

Taken together Mr. Espino's lack of disciplinary infractions and other history and characteristics weigh in favor of a reduced sentence. Section § 3553(a)(2) requires a court to consider the necessity of the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence, protect the public, and provide Mr. Espino with rehabilitative services. These factors weigh strongly in favor of the relief requested here. Over the past 19 years Mr. Espino has already served in prison, he has fulfilled the objective of § 3553(a)(2) that incarceration "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." Indeed, he has completed many rehabilitative and life skills programs as outlined above.

**Mr. Espino is Not a Danger**

If Mr. Espino were released, he would not pose a danger to the safety of any person or the community. His criminal conduct occurred when he was still a young man. Mr. Espino has become a model prisoner. His active and constructive participation in numerous activities and programs, and his maintaining a job while incarcerated, demonstrate that he has learned ways to overcome disadvantages related to his upbringing in a dangerous environment in and that he is now capable of regulating his once impulsive behaviors. He even used the skills he learned to help train other prisoners. Mr. Espino has had significant time to think about and process his actions. He has sincere remorse for his crimes, and recognizes the recklessness that he exhibited as an impressionable young man and the pain it has caused to both his victims and his family.

The Federal Bureau of Prisons based on the facts of this case, Espino's rehabilitation as well as prison conduct have scored Mr. Espino as a low recidivism offender. See Exhibit E. What that means is that Mr. Espino is not likely to ever reoffend if granted this Courts mercy. Some people do change, and when that change has been made, federal tax dollars should not be wasted on overincarcerating our citizens.

At the time of sentencing what decision makers cannot measure is the capacity for people to change.  However, some people do. Mr. Espino is one of those people.  Former President Trump himself acknowledged that people do

27

change, and he did so when he released Alice Marie Johnson from the life sentence that was imposed on her. We also saw Matthew Charles released from prison based on the *First Step Act* - and it was President Trump who invited Mr. Charles to the State of The Union Address. When the Court originally sentenced Mr. Charles to 35 years in prison, it could not have foreseen the changes that he made in his life - never receiving a disciplinary report while in prison, helping others with their legal pleadings, studying the bible, teaching GED classes. Mr. Charles changed his character so much that the President invited this man to the State of the Union address. Mr. Charles' original sentence of 35 years was largely driven because of his criminal history. At the time of sentencing, the sentencing judge explained that Mr. Charles had "a particularly violent history" and "had demonstrated by his actions that he's a danger to society and should simply be off the streets." ***United States v. Charles***, 843 F.3d 1142, 1145, (6th Cir. 2016), (Dkt. # 96 Sentencing Transcript @ page 283). That history included "kidnapping a woman on two consecutive days for the purpose of terrorizing her; burglarizing a home; fleeing from a police interrogation, shooting a man in the head, and attempting to run off in the victim's car. Mr. Charles is now a free man living a law-abiding life despite this record, after having served 21 years in prison; a much shorter term of imprisonment than Espino. However, this is an example that people do change, and do deserve second chances. Mr. Espino is one of them people.

Mr. Espino has a family that loves and cares for him.  They are ready and

willing to assist with a successful reentry. If released, Mr. Espino would be living

with his mother Rita Espino at 6 NE 62 PL. Gladstone, MO 64118. He has a strong

support subsystem including prospective employment. Friends and family fully

support Mr. Espino, and are ready and willing to assist him with a successful

reentry. See Exhibit F.

Mr. Espino has also exhausted his administrative remedy. The warden has

not moved the court within 30 days from that request thus this court can rule on the

current request. See Exhibit G.

Espino submits that he is no longer a threat to public safety.  The biggest

indicator of this is his commitment to rehabilitation, and dramatic character

change. The Court should also consider whether, upon release, the defendant

would pose "a danger to the safety of any other person or to the community."  This

Court is not faced with a stark choice between simply turning Espino loose, or

continuing his incarceration. The Court has the option of reducing Espino's period

of incarceration, followed by a term of supervised release.

Supervised release, which is laid out at 18 U.S.C. § 3583, was created by

Congress as "a form of post confinement monitoring overseen by the sentencing

court." *Johnson v. United States*, 529 U.S. 694, 696-97 (2000).  As the Supreme

Court has explained, "Congress intended supervised release to assist individuals in

their transition to community life.  Supervised release fulfills rehabilitative ends,"

providing "individuals with post confinement assistance" through the supervision

of the court.  *United States v. Johnson*, 529 U.S. 53, 59 (2000).  "The court can

provide such assistance because, '[w]hile on supervised release, the offender [is]

required to abide by certain conditions,' *Johnson v. United States*, 529 U.S. at

697, such as regularly reporting to a probation officer, pursuing schooling or work,

and refraining from further criminal activity, *see* U.S.S.G. § 5D1.3(c); 18 U.S.C. §

3583(d)." *United States v. Island*, 916 F.3d 249, 253 (3d Cir. 2019).  Congress

has also authorized supervising courts to revoke supervised release and order re-

imprisonment when defendants fail to meet their release conditions.  *See* 18 U.S.C.

§ 3583(e); *Johnson v. United States*, 529 U.S. at 697.

Supervised release is routinely imposed as a component of sentencing,

including sentences for crimes far more serious than those of which Espino has

been convicted.  Supervised release affords the court an array of conditions which

it can impose, the defendant's compliance with which will be monitored by a

probation officer.  New conditions can be added as necessary. Beyond the low risk

that Espino now presents, whatever risk there is can be further mitigated by

supervised release. *See United States v. Williams*, No. 04cr95, 2020 WL 1751545,

at *3 (N.D.Fla. Apr. 1, 2020) (although court could not conclude that defendant

posed no risk at all to public safety, "the risk of him engaging in further criminal

conduct is minimal and can be managed through home confinement and the terms of his supervised release."

There are numerous reasons that demonstrate extraordinary and compelling reasons to reduce the sentence in this case.

## **CONCLUSION**

Mr. Espino is asking this Court for compassion, and in asking for that compassion, he asks that the Court consider the fact that he came to prison at the age of 20 years old as an immature young man who made irrational and irresponsible decisions that he deeply regrets today. He is no longer that person. President Abraham Lincoln once said, *"I have always found that Mercy bears richer fruits than strict justice."* Mr. Espino is asking this Court for the same mercy spoke about by President Lincoln.

This request for compassionate release is a request for a second chance for Mr. Espino to reclaim his life. To be the son, brother, husband, father, and law-abiding citizen he was meant to be.

Respectfully Requested,

Noe Espino
Noe Espino

Dated: June ___27___, 2022

## CERTIFICATE OF SERVICE

I, Noe Espino, hereby certify that on this _27_ day of June, 2022, I did place

the enclosed Motion Requesting a Reduction in Sentence Pursuant to 18 U.S.C. §

3582, in the prison mailing system addressed to the following parties:

        United States District Court
        Court Clerk
        500 State Ave
        Kansas City, KS 66101

        United States Attorney's Office
        500 State Street
        Kansas City, KS 66101

Signed under the penalty of perjury

this _27_ day of June, 2022.

_Noe Espino gc_
Noe Espino